624 S.E.2d 797

**FAIRMONT GENERAL HOSPITAL, INC. Petitioner Below, Appellee,**

v.

**UNITED HOSPITAL CENTER, INC., and West Virginia United Health System, Inc., Respondents Below, Appellants,**

and

**West Virginia Health Care Authority, Respondent Below, Appellant.**

No. 32669, 32670.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 5, 2005.

Filed: Nov. 29, 2005.

Robert J. O'Neil, Esquire, Jill C. Bentz, Esquire, Michael S. Garrison, Esquire, Spil-man Thomas & Battle, PLLC, Stephen B. Farmer, Esquire, Farmer, Cline & Campbell, PLLC, Thomas R. Goodwin, Esquire, Johnny M. Knisely, II, Esquire, Goodwin & Goodwin, LLP, Charleston, for Appellants United Hospital Center, Inc. and West Virginia United Health System, Inc.

Marianne Kapinos, Esquire, Cynthia H. Dellinger, Esquire, West Virginia Health Care Authority, Charleston, for Appellant West Virginia Health Care Authority.

G. Nicholas Casey, Jr., Esquire, Thomas G. Casto, Esquire, Webster J. Arceneaux, III, Esquire, Amanda M. Ream, Esquire, Lewis Glasser Casey & Rollins PLLC, Charleston, for Appellee, Fairmont General Hospital, Inc.

The Opinion of the court was delivered by Justice BENJAMIN.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice STARCHER dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice.

These consolidated cases [1] are before the Court upon the appeals of United Hospital Center, Inc. ("UHC"),[2] West Virginia United Health Care System, Inc. ("WVUHS"),[3] and the West Virginia Health Care Authority ("Authority") [4] from the November 24, 2004 Opinion/Order of the Circuit Court of Marion County, West Virginia, in Civil Action No.

---

[1]. Appellants United Hospital Center, Inc. and West Virginia United Health System, Inc. jointly, and Appellant West Virginia Health Care Authority, Inc. separately, filed petitions for appeal (Nos. 050368 and 050369) with this Court from an Opinion/Order of the Circuit Court of Marion County, West Virginia, entered on November 24, 2004, in Civil Action No. 04–P–63. In a Stipulation filed with the Court on March 14, 2005, the three Appellants and the Respondent, Fairmont General Hospital, Inc., agreed and stipulated, pursuant to Rule 3(d) of the West Virginia Rules of Appellant Procedure, that the proceedings in connection with the petitions of appeal be consolidated. The petitions for appeal were granted on May 9, 2005, and consolidated. The joint petitions for appeal of United Hospital Center, Inc. and West Virginia United Health System, Inc. were assigned Case No. 32669 and the separate petition for appeal of the West Virginia Health Care Authority was assigned Case No. 32670.

[2]. UHC, a non-profit corporation, owns and operates a 375–bed regional referral hospital in Clarksburg, West Virginia.

[3]. WVUHS is a non-profit corporation which serves as the sole member of UHC and West Virginia University Hospitals, Inc.

[4]. The Authority was formally known as the West Virginia Health Care Cost Review Authority. The Legislature changed its name in 1997. See W. Va.Code § 16–29B–5 (2001). The Authority, an autonomous division of the Department of Health and Human Resources, administers the certificate of need program as provided in W. Va.Code § 16–2D–1, et seq. See W. Va.Code § 16–29B–5 and W. Va.Code § 16–2D–5(a) (1999).

04–P–63, being an administrative appeal styled *Fairmont General Hospital, Inc., Petitioner, v. West Virginia Health Care Authority, United Hospital Center, Inc., and West Virginia United Health System, Inc., Respondents.* The November 24, 2004 Opinion/Order of the circuit court reversed the May 3, 2004 decision of the Office of Judges,[5] which had affirmed a decision by the Authority, dated October 24, 2003, to approve UHC's and WVUHS' application for a certificate of need[6] to construct a hospital facility in Bridgeport, West Virginia, to replace UHC's existing hospital facility located in Clarksburg, West Virginia.

Having considered the Appellants' petitions for appeal, the record submitted to the Court, the briefs of the Appellants and Appellee, the *amicus curiae* brief of the Affiliated Construction Trades Foundation, and the oral argument of counsel, we reverse the circuit court's Opinion/Order of November 24, 2004, in Civil Action No. 04–P–63, for the reasons stated below.

## I.

## BACKGROUND

On July 18, 2002, UHC and WVUHS filed an application with the Authority seeking the issuance of a certificate of need to permit construction of a 318–bed hospital facility on a 125–acre site in Bridgeport, West Virginia, immediately off the Jerry Dove exit on I–79.

The new UHC hospital would replace UHC's existing 375–bed hospital located at Route 19 South and Davisson Run Road on the southwest side of Clarksburg, West Virginia.

In its October 24, 2003 decision, the Authority considered the record before it, including arguments for and against the granting of a certificate of need for a replacement hospital for UHC. In its decision, the Authority considered the statutory requirements set forth in W. Va.Code § 16–2D–9(b) (1999), which declares that "[a] certificate of need may only be issued if the proposed new institutional health service is: (1) Found to be needed; and (2) Except in emergency circumstances that pose a threat to public health, consistent with the state health plan."[7] In keeping with W. Va.Code § 16–2D–5(b), this determination by the Authority included consideration of "the certificate of need standards" ("standards"). Included within these standards, was a limitation that replacement hospital facilities be *no more* than five miles from the hospital facility being replaced. Attention, in part, was focused on concerns that the proposed site of the replacement hospital was too far from UHC's existing hospital, being some eight miles away.

In addition to its consideration of the Certificate of Need Standards, which are *not* legislative rules, the Authority also considered the Certificate of Need Rule,[8] which is a

5. The agency of the State designated by the Governor to review final decisions of the Authority. *See* W. Va.Code § 16–2D–10(a) (1999).

6. A "certificate of need" is defined in the Authority's Certificate of Need Rule, 65 C.S.R. 7.2.6, as meaning "a document issued by the [West Virginia Health Care Authority] which indicates that a proposed new institutional health service is in compliance with the intent, purposes and provisions of W. Va.Code § 16–2D–1 et seq., and that a need exists for the proposed new institutional health service."

7. The phrase "consistent with the state health plan" is found in at least three other provisions of Article 2D of Chapter 16 of the W. Va.Code: In W. Va.Code § 16–2D–5(d) and (e) and in W. Va.Code § 16–2D–9(f)(1). The phrase also appears in W. Va.Code § 9–5–19(d)(1) (2003). "State health plan" is defined in W. Va.Code § 16–2D–2(ee) (1999) as meaning "the document approved by the governor after preparation by the former statewide health coordinating council, or that document as approved by the governor

after amendment by the former health care planning council or the state agency." The "document" is neither defined nor described. The current state agency is known as the "West Virginia Health Care Authority." W. Va.Code § 16–29B–5(1997).

8. The Authority's Certificate of Need Rule is not the same as the Certificate of Need Standards. The Certificate of Need Rule is a legislative rule promulgated pursuant to Chapter 29A of the W. Va.Code. *See* W. Va.Code § 16–2D–8 (1999). This rule was promulgated by the Authority some years before its consideration of the proposed UHC replacement hospital in this case. Citing W. Va.Code § 16–2D–3(b)(5), 7(u) and 8(c) (1999), all relating to emergency rules, as its statutory authority, this Certificate of Need Rule was established to implement the provisions of the Certificate of Need program found in W. Va.Code § 16–2D–1 *et seq.*, and became effective as of July 1, 2000. The Certificate of Need Standards, on the other hand, are a part of the State Health Plan and exist by virtue of executive

legislative rule. The Certificate of Need Rule appears in 65 C.S.R. 7–1 to –28. Section 65 C.S.R. 7–2 of the Certificate of Need Rule defines certain terms used therein, including the term, "Consistent with the State Health Plan", in subsection 2.7. As therein defined, the term means "a determination made by the [Authority] that the preponderance of the evidence supports the achievement of the applicable provisions of the State Health Plan [which would include the five-mile provision in the Plan] unless the Plan is in conflict with any statute or this rule."

In its October 24, 2003 decision granting UHC's and WVUHS' certificate of need, the Authority, at pages 61–62, made the following rulings:

The West Virginia Certificate of Need Rule, 65 C.S.R. § 7–1 *et seq.* does not require an application for a certificate of need to be *perfectly consistent* with the [State Health Plan]. Rather, the [Certificate of Need] Rule defines the term "consistent with the State Health Plan" to mean "a determination made by the [Authority] that the preponderance of the evidence supports the achievement of the applicable provisions of the State Health Plan...." 65 C.S.R. § 7–2.7.

The development of the applicant's proposed replacement hospital eight miles rather than five miles from the existing hospital *is not materially inconsistent with the definition of a "replacement" facility.* The current [Certificate of Need] Standards for the "Renovation–Replacement of Acute Care Facilities and Services", although not applicable to this case, define a "replacement" to be within fifteen (15) miles of the original facility.[9] The applicant had the option to file its application under the current standards and elected not to do so due to the cost of filing a new application.[10]

The [Authority] has carefully considered the arguments on this issue and finds that the proposed location of the replacement facility more than five miles from the original facility does not automatically require the Authority to reject the proposal. In the present case, the facility is to be located approximately eight miles from the existing one.

(Emphases added.)

Pursuant to W. Va.Code § 16–2D–10, Fairmont General Hospital, as an "affected person" defined in W. Va.Code § 16–2D–2(a) (1981), sought review by the Office of Judges of the Authority's decision of October 24, 2003. In its decision of May 3, 2004, the Office of Judges affirmed the Authority's decision, stating at page 5:

The Authority articulated its rationale in arriving at the conclusion that "8 miles" was consistent, albeit not exact, with the 5–mile limit in the applicable Standards for hospital replacement. The Authority acknowledged that it could require UHC to execute a "new filing" to meet strict compliance with the five mile language of the standard in place at the time of their [sic] application. This, however, would be a superfluous act. The Authority was well within its discretion in finding *substantial compliance*, in spite of the 3–mile deviation from the Standard.

(Emphasis added.)

Pursuant to W. Va.Code § 16–2D–10, Fairmont General Hospital appealed the May 3, 2004 decision of the Office of Judges to the Circuit Court of Marion County. The circuit court, in an Opinion/Order entered on November 24, 2004, reversed the decisions of both the Authority and the Office of Judges on the ground that the replacement hospital would not, when constructed, be within five miles of the hospital to be replaced. In reversing the Office of Judges, the circuit

---

department action alone. The procedure for amending or modifying the Certificate of Need Standards is set forth in W. Va.Code § 16–2D–5(1). That procedure requires the Authority to "file with the secretary of state, for publication in the state register, a notice of proposed action, including the text of all proposed amendments and modifications [of the Certificate of Need Standards], and a date, time and place for receipt of general public comment."

**9.** Actually, "in the same county or within fifteen (15) miles of the original facility."

**10.** The applicants paid a fee of $265,174 to file it's certificate of need application. A fee in like amount would have been required had the applicants refiled their application after October 9, 2002, when the five-mile limitation was replaced with "in the same county or within the fifteen (15) miles of the original facility."

court relied upon Section I(W) of the State Health Plan Certificate of Need Standards, entitled "Renovation–Replacement of Acute Care Facilities and Services", which, in relevant part, declared:

> Replacement: A project for the ... construction ... of a physical plant or facility as a result of which:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> 2. All hospital beds are, or will be, located within five miles of the original facility following completion of the project.[11]

(These quoted provisions will hereinafter be referred to either as the "five-mile limitation" or simply as "the limitation".) In its eighth Conclusion of Law, the circuit court stated that "[n]o exception exists which would allow the [Authority] to deviate from the regulatory mileage limit." UHC, WVUHS, and the Authority thereupon appealed the circuit court's decision to this Court.

Since the parties agree that the sole issue to be decided by the Court in this appeal is whether UHC's and WVUHS' proposed replacement hospital is "consistent with the state health plan", as required by W. Va. Code § 16–2D–9(b)(2) (1981), and specifically with the plan's requirement that a replacement hospital be "located within five miles of the original facility", it is not necessary to further review (1) the facts upon which the Authority found that the replacement hospital is needed since that finding is not challenged on appeal; (2) UHC's and WVUHS' application filed with the Authority seeking a certificate of need; or (3) the administrative

proceedings before the Authority which culminated in its issuance of the certificate of need sought by UHC and WVUHS.

## II.

### STANDARD OF REVIEW

■ "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. pt.1, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996).

## III.

### DISCUSSION

■ Although the parties agree that the ultimate question for the Court to determine is whether the site approved by the Authority for the construction of UHC's replacement hospital eight miles from the hospital to be replaced is "consistent with the state health plan" and concentrate their advocacy on the intent of that phrase, we believe the first issue to be considered is the threshold determination of whether the five-mile limitation as imposed by the Authority and the Governor conflicts with provisions of W. Va.Code § 16–2D–1 *et seq.,* or is not authorized by legislative guidelines provided for the exercise of powers conferred upon the executive department. In other words, is the limitation a legally valid restriction?[12] The parties to the appeal and the *amicus* accepted the

---

**11.** The quoted provisions of the Certificate of Need Standards were approved by the Governor on January 7, 1997, and were in effect when UHC's and WVUHS's application for a certificate of need was declared complete by the West Virginia Health Care Authority on August 2, 2002. Some two months after that date, specifically on October 9, 1992, the Governor approved revisions in the quoted provisions, which are set forth in Section I(EE) of the Certificate of Need Standards and which, in relevant part, declare that "All beds in the replacement facility must be located in the same county or within fifteen (15) miles of the original facility." The Appellants and the Appellee agree that Section I(W) of the Certificate of Need Standards that was approved by the Governor on January 7, 1997, and that was in effect on August 2, 2002, rather than Section I(EE) of those Standards that was ap-

proved by the Governor on October 9, 2002, controlled the disposition of the application for the certificate of need and control the outcome of this appeal.

**12.** W. Va.Code § 29A–5–4(e) (1998) provides that "the Court may consider and decide errors which are not assigned or argued." *De Novo* review on appeal means that the result and not the language used in or reasoning of the lower tribunal's decision is at issue. A reviewing court may affirm a lower tribunal's decision on any grounds. *See GTE South, Inc. v. Morrison,* 199 F.3d 733, 742 (4th Cir., 1999) ("if the administrative order reaches the correct result and can be sustained as a matter of law, we may affirm on the legal ground even though the agency relied on a different rationale").

validity of the limitation without discussion.[13] However, before this Court entertains a discourse between the parties on the question of whether "substantial, but not perfect" consistency compels a finding of compliance under the law, we must first consider the legal validity of the underlying mileage limitation which itself is at the heart of this appeal and which serves as the necessary predicate to any consideration of "consistency" and "compliance."

### A. Validity of the Five–Mile Limitation

■ We commence with the Authority's Certificate of Need Rule which defines in Subsection 2.7 thereof (65 C.S.R. § 7–2.7) the phrase "consistent with the state health plan" as used in the Rule to mean "a determination made by the [Authority] that the preponderance of the evidence supports the achievement of the applicable provisions of the State Health Plan *unless the Plan is in conflict with any statute or this rule.*" (Emphasis added.) Here, the Authority has appropriately recognized that a proposed replacement hospital for which a certificate of need is sought is not required to be consistent with a provision in the State Health Plan, such as the five-mile limitation, if the provision conflicts with a statute or the Certificate of Need Rule.

Our review of applicable West Virginia law reveals that the five-mile limitation does, indeed, conflict with a statute, specifically, W. Va.Code § 16–2D–6(d), which provides that "[a]n application for a certificate of need may not be made subject to any criterion not contained in [W. Va.Code § 16–2D–1 *et seq.*] or not contained in rules adopted pursuant to [W. Va.Code § 16–2D–8]." Similarly, according to W. Va.Code § 16–2D–9(d), the "[i]ssuance of a certificate of need ... may not be made subject of any condition unless the condition directly relates to criteria in [W. Va.Code § 16–2D–1 et seq.] or in rules adopted pursuant to [W. Va.Code § 16–2D–8]." It is apparent that the Legislature used "criterion" in W. Va.Code § 16–2D–6(d) and "condition" in W. Va.Code § 16–2D–9(d) as synonymous terms. The five-mile limitation is such a criterion or condition and it is not contained in either W. Va.Code § 16–2D–1 et seq. or in rules adopted by the Authority (or its predecessor agency) pursuant to W. Va. Code § 16–2D–8 (1999).

The minimum criteria for certificate of need reviews are set forth in W. Va.Code § 16–2D–6(a)(1)–(23) and (e), (f) and (g) (1999). Not one of those criteria contains a mileage limitation on the relocation of an existing hospital to which an application for a certificate of need therefor is made subject. Nor does the five-mile limitation directly relate to any of those criteria. W. Va.Code § 16–2D–6(b) authorizes the Authority to "include additional criteria which it prescribes by rules pursuant to [W. Va.Code § 16–2D–8]." 65 C.S.R. § 7–12 of the Certificate of Need Rule sets forth "Review Criteria." Rather than being "additional criteria", the administrative "Review Criteria" repeat the statutory criteria.[14] Not one of the crite-

---

**13.** Even though they accepted its validity, the Court would have been helped in its understanding of the limitation had the parties, particularly the Authority, informed the Court as to (1) whether the original Certificate of Need Standards contained a mileage limitation on the site of a replacement hospital; (2) whether there was a mileage limitation amended into the Certificate of Need Standards between the original Standards and January 6, 1997; (3) the reason the five-mile limitation was amended into the Certificate of Need Standards effective with the Governor's approval thereof on January 7, 1997; (4) whether the five-mile limitation was suggested by the Governor or originated with the Authority or its predecessor agency; (5) what was the change in circumstances, if any, or reason that called for modification and enlargement of the mileage limitation brought about by the October 2002 amendment of the Certificate of Need Standards and whether the modification was suggested by the Governor or originated with the Authority or

its predecessor agency; (6) why there is a geographic limitation on the site of a replacement hospital but not on the site of a new hospital that does not replace an existing one; and (7) the source of statutory authority for Sections I(W) and the later Section I(EE) of the Certificate of Need Standards for the Renovation–Replacement of Acute Care Facilities and Services.

**14.** Subsections 12.1, 12.1.a. and 12.1.1.b. thereof are copied verbatim from W. Va.Code § 16–2D–9(b)(1) and (2). Subsections 12.2, 12.2.a. through 12.2.e. thereof are copied substantially verbatim from W. Va.Code § 16–2D6(e) (1999); Subsections 12.3, 12.3.a. through 12.3.u. thereof are copied substantially verbatim from W. Va. Code § 16–2D–6(a)(1) through (21); Subsection 12.3.v. thereof is copied verbatim from W. Va. Code § 16–2D–6(a)(23); Subsection 12.3.w. thereof is adapted from W. Va.Code § 16–2D–6(a)(11); Subsection 12.4. thereof is copied substantially verbatim from W. Va.Code § 16–2D–

ria set forth in Certificate of Need Rule, 65 C.S.R. § 7–12, contains a mileage limitation on the relocation of an existing hospital. Nor does the five-mile limitation directly relate to any of those criteria.

Accordingly, since the five-mile limitation is not contained in, and does not directly relate to, any of the criteria in W. Va.Code § 16–2D–6 or in the Certificate of Need Rule, UHC's and WVUHS' application for a certificate of need and the Authority's issuance of the certificate could not validly be made subject to that limitation.

In *Department of Health and Rehabilitative Services v. Johnson and Johnson Home Health Care, Inc.*, 447 So.2d 361 (Fla.Ct.App. 1984), the District Court of Appeal of Florida considered the validity of an administrative rule that prescribed "a threshold requirement for issuance of a certificate of need (CON) to a home health care provider that each existing provider within the service area must be seeing an average of 300 patients per day according to the census of the last calendar quarter." *Johnson and Johnson Home Health Care*, 447 So.2d at 362. The court noted that "[t]he stated purpose of the rule was to halt the proliferation of home health agencies." *Id.* However, "[t]he record before the hearing officer showed that the rule of 300 was designed to protect the existing industry from competition." *Id.* at 362. The court concluded that "[t]here is no reasonable relationship shown between the prohibition of the rule and the health, morals, safety or welfare of the public. The rule is arbitrary and capricious and cannot stand." *Id.* at 363. The court then took note of the statutory criteria for evaluating applications for certificates of need, after which it stated: "The hearing officer correctly concluded that the rule of 300 precluded a balanced consideration of all statutory criteria. The rule allows [the Department of Health and Rehabilitative Services] to ignore some statutory criteria and emphasize others, contrary to the legislative purpose it is supposed to implement. The rule exceeds delegated legislative authority." (Internal citations omitted)

Similarly, it may be said the five-mile limitation precludes a balanced consideration of all the statutory criteria for certificate of need reviews set forth in W. Va.Code § 16–2D–6. Consider only two of those criteria, the ones provided in Subsections 6(a)(11) and (15) of Article 2D. In Subsection 6(a)(11), the Authority is obligated in the case of the relocation of a health care facility to consider "the need that the population presently served has for the service, the extent to which that need will be met adequately by the proposed relocation or by alternative arrangements, and the effect of the ... relocation of the service on the ability of low income persons, racial and ethnic minorities, women, handicapped persons, other medically underserved population, and the elderly, to obtain needed health care." Limiting the construction of a replacement hospital to within five miles of the existing hospital may diminish the ability of the described persons to obtain needed health care. As the Florida court said, such a limitation precludes a balanced consideration of the statutory criteria.

W. Va.Code § 16–2D–6(a)(15) obligates the Authority to consider the accessibility of the proposed health services "to all the residents of the area to be served by the services." Again, an arbitrary five-mile limitation may well diminish the accessibility of the relocated hospital to the residents of the area to be served by the facility.

The circuit court in its Opinion/Order of November 24, 2004, stated in its twelfth Conclusion of Law that one purpose of the five-mile limitation "is to protect other area hospitals from the encroachment of new facilities into areas traditionally serviced by those other area hospitals." While it is not difficult to assume that such was the purpose of the limitation, the circuit court cited no source for the statement that such was the reason for the limitation. If that were the purpose of the limitation, and we can conceive of no other more logical one, we have found no clear legislative policies or guidelines that would have authorized the Authority and the Governor to incorporate a five-mile limitation

6(f); and Subsection 12.5. thereof is copied substantially verbatim from W. Va.Code § 16–2D–

6(g).

into the Certificate of Need Standards, a subject we now consider in greater detail.

It is appropriate to ask where are the Legislature's public policy objectives and guidelines which provided authority to the Authority (or its predecessor agency) and the Governor to incorporate a five-mile limitation into the Certificate of Need Standards of the State Health Plan? This Court stated as recently as 2003 in *State ex rel. West Virginia Citizens Action Group v. West Virginia Economic Development Grant Committee*, 213 W.Va. 255, 580 S.E.2d 869 (2003), that

> the Legislature must articulate with sufficient clarity its public policy objectives to permit the executive department to effectuate those policy objectives and to educate the public as the legislature's intentions. We made clear in *State ex rel. Mountaineer Park, Inc. v. Polan* [190 W.Va. 276, 438 S.E.2d 308 (1993)] that the Legislature cannot "grant ... unbridled authority in the exercise of the power conferred upon ... [an administrative agency]." Syl, Pt. 2, in part, 190 W.Va. at 277, 438 S.E.2d at 309.

*Id.* at 272, 580 S.E.2d at 886 (footnote omitted). In that same case, we recognized the concern raised by another court "that caprice would control the decision making process in the absence of clear [legislative] guidelines." *Id.* We held therein "that when an enabling statute such as West Virginia Code § 29–22–18a(d)(3) extends discretion to the executive branch in contemplation of an expenditure of public funds with only a broad statement of legislative intent and insufficient legislative guidance for the execution of that legislative intent, the Legislature has wrongfully delegated its powers to legislate in violation of article six, section one of the state constitution." *Id.* at 272–3, 580 S.E.2d at 886–7.

The Legislature has empowered the Authority to adopt amendments or modifications of the Certificate of Need Standards with the Governor's approval (W. Va.Code § 16–2D–5(1)(1) and (2)); to promulgate emergency rules to specify the health ser-

vices which are subject to certificate of need review (W. Va.Code § 16–2D–3(b)(5)); to promulgate emergency rules to establish a review process for nonhealth related projects (W. Va.Code § 16–2D–7(u)) (1999); to adopt rules prescribing criteria in addition to those set forth in W. Va.Code § 16–2D–6 for certificate of need reviews (W. Va.Code § 16–2D–6(b)); and to promulgate certain additional rules, including emergency rules (W. Va. Code § 16–2D–8). What then were the public policy objectives and the guidelines provided to the Authority and the Governor by the Legislature that would have authorized the Authority and the Governor to incorporate the five-mile limitation into the Certificate of Need Standards? If there are no such objectives or guidelines or if they are insufficient to evidence a clear legislative intent, then in such case the Authority and the Governor have unbridled power, and may act with caprice and arbitrariness, in violation of Article VI, § 1 of the State Constitution.

The Court's research indicates that the Legislature has not specified any clear public policy objectives or guidelines that would have authorized the five-mile limitation. If any such policies or guidelines can be said to exist, they are obscure in that they have to be ferreted out of the Legislature's findings and declarations in W. Va.Code § 16–29B–1 (which have more to do with the purposes of Article 29B than with the purposes of Article 2D of Chapter 16 of the W. Va.Code) and in the legislative findings in W. Va.Code § 16–2D–1. Even so, the limitation appears to conflict with, rather than to be supported by, those findings and declarations.

In W. Va.Code § 16–29B–1 (1997),[15] the Legislature identified a number of threats to the health and welfare of the citizens of the State, two of them being "a fragmented system of health care [and] lack of integration and coordination of health care services." In order to alleviate those threats, the Legislature declared that "an entity of state government [presently, the Authority] must be giv-

---

**15.** Admittedly, the provisions of W. Va.Code § 16–29B–1 surveyed in this paragraph of the text did not become effective until ninety days after April 12, 1997, the date of passage of Ch. 102, Acts, Regular Session, 1997. That would have been some six months after January 7,

1997, the date the Governor approved the five-mile limitation. As of that date, the Legislature's findings and limitations contained in W. Va.Code § 16–29B–1 were even more limited and related exclusively to the containment of cost of acute care hospital services.

en authority ... to assure that the state health plan, certificate of need program ...serve to promote cost containment, access to care, quality of services and prevention." *Id.* The five-mile limitation may do more to promote, than to alleviate, "a fragmented system of health care," and a "lack of integration and coordination of health care services." In addition, the five-mile limitation may well be a hindrance, rather than a help, in promoting "access to care, quality of services and prevention." In any case, the Authority ought not be bridled, without clear legislative–permitting guidelines, by such a self-imposed arbitrary limitation as it goes about implementing its statutory mission, including its consideration of statutory criteria for certificate of need reviews.

In W. Va.Code § 16–2D–1 (1977), the Legislature declared it "to be the public policy of this State:

(1) That the offering or development of all new institutional health services shall be accomplished in a manner which is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the institutional health services of the people of this state and to avoid unnecessary duplication of institutional health services, and to contain or reduce increases in the cost of delivering institutional health services.

(2) That the general welfare and protection of the lives, health and property of the people of this state require that the type, level and quality of care, the feasibility of the providing such care and other criteria as provided for in this article or by the state health planning and development agency pursuant to provisions of this article, needed in new institutional health services within this State be subject to review and evaluation before any new institutional health services are offered or developed in order that appropriate and needed institutional health services are made available for persons in the area to be served.

The five-mile limitation may well preclude the accomplishment of new institutional health services "in a manner which is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the institutional health services of the people of this state."

The limitation may also not permit the Authority to "avoid unnecessary duplication of institutional health services, and to contain or reduce increases in the cost of delivering institutional health services." In addition, the limitation may also restrict the Authority in how it can best provide for "the general welfare and protection of the lives [and] health of the people of this State," and make "available [new needed institutional health services] for persons in the area to be served."

All in all, the five-mile limitation bespeaks capriciousness and arbitrariness. That characterization is further supported by the facts (1) that within less than six years after the Authority (or its predecessor agency) and the Governor imposed the five-mile limitation, they extended it to fifteen miles and allowed a replacement hospital to be constructed within the same county as the existing facility regardless of distance; and (2) that the Authority in issuing a certificate of need to UHC and WVUHS ruled that eight miles "is not materially inconsistent with [five miles]." The Authority has thus itself acknowledged the arbitrariness of the restriction by greatly expanding its radius in 2002 and by giving the limitation an elasticity of its choosing in a specific case.

Accordingly, we hold that Section I(W) of the Certificate of Need Standards of the State Health Plan for the Renovation–Replacement of Acute Care Facilities and Services approved on January 7, 1997 is invalid insofar as it requires the replacement facility be within five miles of the original facility. The five mile limitation is invalid because it (1) conflicts with W. Va.Code § 16–2D–6(d) (1999); (2) is a criterion not included within the criteria for certificate of need reviews set forth in W. Va.Code § 16–2D–6(a) (1999) or in 65 C.S.R. § 7–12; (3) was promulgated by the executive department of state government without clear legislative public policy objectives and guidelines; (4) precludes a balanced consideration of the statutory criteria for certificate of need reviews as set forth in W. Va.Code § 16–2D–6 (1999); (5) conflicts with, rather than supports, the findings and declarations of the Legislature set forth in W. Va.Code § 16–29B–1 (1997) and W.

Va.Code § 16–2D–1 (1977); and (6) is arbitrary and capricious. Since we now invalidate the five-mile limitation in the Certificate of Need Standards of the State Health Plan, it is not necessary for us to consider whether the site of UHC's and WVUHS' proposed replacement hospital is "consistent with [ that limitation in] the state health plan" as required by W. Va.Code § 16–2D–9(b)(2).

## IV.

## CONCLUSION

The circuit court's Opinion/Order dated November 24, 2004 is reversed and this case is remanded for issuance of a certificate of need consistent with the West Virginia Health Care Authority's decision of October 24, 2003.

Reversed and remanded with directions.

DAVIS, J., concurring.

In this proceeding, the majority opinion has reinstated the certificate of need issued to United Hospital Center, Inc. (United) by the West Virginia Health Care Authority (HCA). I concur in the judgment reached by the majority opinion. I have chosen to write separately because I believe a different analysis should have been applied to attain the proper legal result.

### A. The Certificate of Need Standards

The majority opinion acknowledged that none of parties raised the issue of whether HCA had authority to modify or amend certificate of need requirements. Nevertheless, the majority chose to sua sponte address this issue. In doing so the majority determined

that, pursuant to W. Va.Code § 16–2D–6(d) (1999) (Repl.Vol.2001), "[a]n application for a certificate of need may not be made subject to any criterion not contained in [W. Va.Code § 16–2D–1 et seq.] or not contained in rules adopted pursuant to [W. Va.Code § 16–2D–8]." Based upon this finding, the majority opinion determined that the 5 mile geographical limitation created by HCA was invalid because it was not contained in a statute or regulation. This determination by the majority represents a misinterpretation of the law applicable to a certificate of need. I say "misinterpretation" because the majority decision has unnecessarily invalidated all of the certificate of need standards created by HCA that are not contained in a statute or regulation.

There is a difference between the "[m]inimum criteria for certificate of need reviews" under W. Va.Code § 16–2D–6, and the authority of HCA to modify or amend certificate of need standards under W. Va.Code § 16–2D–5 (1999) (Repl.Vol.2001). Pursuant to W. Va.Code § 16–2D–5(l)(1), HCA is granted express authority to propose "amendments or modifications to the certificate of need standards[.]" [1] Further, W. Va. Code § 16–2D–5(l)(2) empowers the governor to "either approve or disapprove all or part of the amendments and modifications[.]" [2]

Pursuant to the authority of W. Va.Code §§ 16–2D–5(l)(1) & (2), HCA has proposed and the governor has approved amendments and/or modifications to the following certificate of need standards:

---

1. W. Va.Code § 16–2D–5(l)(1) (1999) (Repl.Vol. 2001) provides in full:

The state agency shall coordinate the collection of information needed to allow the state agency to develop recommended modifications to certificate of need standards as required in this article. When the state agency proposes amendments or modifications to the certificate of need standards, it shall file with the secretary of state, for publication in the state register, a notice of proposed action, including the text of all proposed amendments and modifications, and a date, time and place for receipt of general public comment. To comply with the public comment requirement of this section, the state agency may hold a public hearing or schedule a public comment period for the receipt of written statements or documents.

2. W. Va.Code § 16–2D–5(l)(2) provides in full:

All proposed amendments and modifications to the certificate of need standards, with a record of the public hearing or written statements and documents received pursuant to a public comment period, shall be presented to the governor. Within thirty days of receiving the proposed amendments or modifications, the governor shall either approve or disapprove all or part of the amendments and modifications, and, for any portion of amendments or modifications not approved, shall specify the reason or reasons for nonapproval. Any portions of the amendments or modifications not approved by the governor may be revised and resubmitted.

Long-term Acute Care Hospitals (approved 7/10/00); Cardiac Surgery Services (approved 5/5/04); Lithotripsy Services (approved 7/7/00); Hospice Services (approved 6/21/01); Cardiac Catheterization (approved 8/22/02); Megavoltage Radiation Therapy Services (approved 10/9/02); Addition of Acute Care Beds (approved 10/9/02); Renovation–Replacement of Acute Care Facilities and Services(approved 10/9/02); Ambulatory Care Centers (approved 10/5/92); Ambulatory Surgical Centers (approved 10/5/92); Positron Emission Tomography (approved 7/7/00); Fixed Magnetic Resonance Imaging Services (approved 11/5/97); Birthing Centers (approved 10/5/92); Home Health Services(approved 11/13/96); Behavioral Health/Developmental Disabilities (approved 11/13/95); ICR/MR Group Homes (approved 10/5/92); In-home Personal Care Services (approved 5/4/99); and End Stage Renal Disease and Home Training (approved 10–5–92).[3]

One of the above certificate of need standards, Renovation–Replacement of Acute Care Facilities and Services,[4] contained a 5 mile geographical limitation [5] which the majority found was not set forth in W. Va.Code § 16–2D–6 or a regulation. Consequently, the majority held that HCA and the governor had no authority to impose the 5 mile geographical limitation. Implicit in this decision is that all of the above certificate of need standards are invalid because they provide factors that are not contained in W. Va.Code § 16–2D–6 or a regulation.

A decision reached this Term of Court illustrates the implications of the majority decision today. In *Family Medical Imaging, LLC v. West Virginia Health Care Authority,* 218 W. Va. 146, 624 S.E.2d 493 (2005), two physicians were denied a certificate of need to provide ultrasound diagnostic services to patients referred to them by other physicians. One of the issues raised in the case was whether HCA relied upon the standard for acute care facilities in denying the certificate of need. This Court concluded that HCA did not rely on that standard, but instead relied upon the Ambulatory Care Centers standard. Ultimately, this Court affirmed the denial of the certificate of need. Under the decision rendered in the instant case, the two physicians may now reapply for a certificate of need and do not have to comply with the Ambulatory Care Centers standard, because that standard cannot be found in W. Va.Code § 16–2D–6 or a regulation. It is therefore invalid under the majority decision. I do not believe the majority intended such an outcome.

**B.** **United Hospital Center Should be Allowed to Keep the Certificate of Need Because of the Change in the Geographical Requirement**

The record is clear. At the time United applied for a certificate of need, the certificate of need standard did not allow United to build its replacement facility outside of 5 miles of its existing facility. United was prepared to build the replacement facility 8 miles outside of its existing facility. Clearly, under the standards existing at the time of United's application, it did not satisfy the geographical limitation of the certificate of need standards. Even so, HCA found that the additional 3 miles was harmless. I disagree.

This Court has consistently held that "[a]n administrative body must abide by the remedies and procedures it properly establishes to conduct its affairs." Syl. pt. 1, *Powell v. Brown,* 160 W.Va. 723, 238 S.E.2d 220 (1977). *See also Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 583 n. 8, 466 S.E.2d 424, 434 n. 8 (1995) ("[A]n agency must follow and apply its rules and regulations in existence at the time of agency action."). Insofar as United did not satisfy the 5 mile limitation at the time of its application, HCA should have denied the certificate of need. Otherwise, HCA would have empowered itself to make arbitrary decisions regarding the geographical limitation.

---

**3.** *See* http://www.hcawv.org/CertOfNeed/con-RevStd.htm.

**4.** I have attached the Renovation–Replacement of Acute Care Facilities and Services certificate of need standards as an appendix to this concurring opinion. I have done this in order to provide an example of what the majority has actually invalidated.

**5.** The geographical limitation has been amended to now read 15 miles.

Although HCA should have denied United's application when the decision was rendered, I would have upheld issuance of the certificate of need because the 5 mile limitation was extended to 15 miles during the pendency of the case. That is, United has now satisfied the current geographical limitation. I believe it would be an unnecessary waste of funds and administrative resources to have United reapply for a certificate of need when the only impediment to its issuance has been removed.

Based upon the foregoing analysis, I respectfully concur.

## RENOVATION–REPLACEMENT OF ACUTE CARE FACILITIES AND SERVICES

### I. DEFINITIONS

A. *Acute Care:* Inpatient hospital care provided to patients requiring immediate and continuous attention of short duration. Acute care includes, but is not limited to, medical, surgical, obstetric, pediatric, psychiatric, ICU and CCU care in a hospital.

B. *Acute Care Bed:* Any licensed inpatient bed dedicated to the use of patients requiring acute care.

C. *Admission Rate:* The number of patients entering the hospital for acute care services per 1,000 population.

D. *Average Daily Census:* The average number of licensed acute care beds in the hospital that are used by inpatients.

E. *Average Length of Stay:* The average number of days a patient stays in the hospital.

F. *Bed:* A general measure of hospital size and capacity.

G. *Capital Expenditure:* Those expenditures as defined in W.Va.Code § 16–2D–2, including a series of expenditures exceeding the expenditure minimum and determined by the Health Care Authority to be a single capital expenditure subject to review.

H. *Coronary Care Unit (CCU):* A special unit of the hospital equipped to provide maximum surveillance and support of vital function and definitive therapy to patients with acute or potentially reversible life-threatening impairment of the cardiovascular system.

I. *Critical Access Hospital (CAH):* A hospital designated as such by the West Virginia Office of Rural Health Policy in conformance with the requirements of the Medicare Rural Hospital Flexibility Program.

J. *Discharge Planning:* A coordinated effort to ensure that each patient to be discharged from a health care facility has a planned program of needed continuing care and follow up that seeks optimum functioning of that patient and the earliest practicable discharge.

K. *Discharge Rate:* The number of patients who have received acute care services discharged per 1,000 population.

L. *Inpatient:* A patient who has been admitted to the hospital for an overnight stay or longer.

M. *Intensive Care Unit (ICU):* Care provided in a specially licensed unit set up for the purpose of providing maximum surveillance and support of vital functions and definitive therapy for patients suspected of having acute, or potentially reversible life-threatening impairment of single or multiple vital systems (pulmonary, cardiovascular, renal or nervous systems). Such a unit requires special equipment and specially trained staff.

N. *Level I Obstetrical Unit:* A hospital obstetric unit, the function of which is to provide services primarily for uncomplicated maternity and newborn patients.

O. *Level II Obstetrical Unit:* A hospital obstetric and neonatal unit, the function of which is to provide a full range of maternal and newborn services for uncomplicated births and for the majority of complicated obstetrical problems and certain neonatal illnesses.

P. *Level III Obstetrical Unit:* A hospital obstetric and neonatal unit, the function of which is to provide care for normal births but especially for all the serious types of maternal-fetal and neonatal illnesses and abnormalities.

Q. *Levels of Care:* A system of categorizing services according to complexity and sophistication. Normally, acute care is divided into three levels: primary, secondary, and

tertiary, with the primary level being comprised of the most basic services and the tertiary level being comprised of the most complex services.

R. *Licensed Beds or Hospital Beds:* The basic index of hospital capacity, consisting of the beds in each hospital which are licensed for acute care use. In the case of state-operated acute care facilities, it is the number set up and staffed.

S. *Neonatal:* A term used to refer to an infant less than 29 days old.

T. *Neonatal Intensive Care Unit:* A specialized medical treatment unit of the hospital set up to provide extraordinary care to critical infants.

U. *Observation Services:* Services ordered by a patient's physician and provided by a hospital on the hospital's premises. These services include the use of a bed and periodic monitoring by the hospital's nursing or other staff, which are reasonable and necessary for a possible admission to the hospital as an inpatient. Observation beds are not licensed acute care beds.

V. *Observation Equivalent Days:* The total observation hours divided by 24. Observation equivalent days may be added to acute care days to demonstrate peak occupancy.

W. *Obstetrics:* The branch of medicine that deals with the care of women before, during, and directly after childbirth.

X. *Occupancy Rate:* The average percentage of licensed beds in a hospital or one of its units that are filled as of midnight each day. To demonstrate peak occupancy, the hospital may also document the occupancy rate at a different time of the day.

Y. *Outpatient* A patient who is not admitted to the hospital for an overnight stay.

Z. *Patient Flow:* A hospital's pattern of patient admissions and discharges.

AA. *Patient Origin Study:* A special study of hospital's patient flow designed to determine the particular geographic areas from which an institution draws its patients and the institutions to which residents from an area go for hospitalization.

BB. *Pediatric:* The branch of medicine that deals with the care of children under 14 years of age.

CC. *Peer Review:* The evaluation of health professionals and their performance by their peers. This term relates to programs such as utilization review and professional review organizations.

DD. *Psychiatric:* The branch of medicine connected with mental disorder.

EE. *Replacement:* A project for the erection, construction, creation or other acquisition of a physical plant or facility. All beds in the replacement facility must be located within the same county or within fifteen (15) miles of the original facility.

FF. *Renovation:* A project for modernization, improvement, alteration or upgrading of an existing physical plant or equipment.

GG. *Swing Beds:* Beds used in small rural hospitals that may be used interchangeably as either general/medical/surgical beds or skilled nursing beds. Reimbursement is based upon the specific type of care provided. Swing bed days may be added to acute care days to demonstrate peak occupancy.

II. CURRENT INVENTORY

The Authority shall provide a current inventory of existing acute care beds and hospital beds by specialty to each applicant.

III. NEED METHODOLOGY

A. The Authority will consider for approval proposals for renovation or replacement of hospital beds or services, if the applicant submits reliable, probative, and substantial evidence that the project is necessary. Such necessity may only be proven by establishing one or more the following:

1. The service(s) provided by the applicant requires space, or the facility requires replacement or renovation to meet minimum requirements documented by written recommendations from appropriate accreditation or licensing agencies or documentation based upon comparisons to the minimum departmental square footage requirements of comparable services.

2. There are significant operating problems that can most effectively be corrected by the proposed replacement or renovation as documented by data re-

garding specific projected cost savings that would be achieved if the project were completed, and the proposed level of investment is appropriate in relation to such projected cost savings.

3. The replacement or renovation is being proposed to correct deficiencies that place the facility's patients' or employees' health and safety at significant risk. Such deficiencies must be demonstrated by reference to the minimum requirements of licensing, regulatory, and accrediting organizations.

B. Regardless of the provisions of Section III(A) above, the Authority will not approve a renovation or replacement if the proposed project will perpetuate or result in excess capacity of acute care beds. For the renovation or replacement of a patient care area, the following requirements also apply:

1. The Authority will not approve any renovation or replacement to a patient care area of a hospital where the number of licensed acute care beds, after completion of the renovation or replacement project, will equal or exceed 160% of the average daily census of the hospital for the past twelve (12) months. The Authority may consider an adjustment by the hospital to its average daily census for observation equivalent days and swing bed days. The Authority may also consider the impact of a distinct part unit on the hospital's average daily census.

2. An applicant must remove acute care beds from its license to meet the 160% requirement. The applicant must submit an amended license to demonstrate the reduction in acute care beds during substantial compliance review.

3. If the removal of acute care beds from the hospital's license would cause a breach of a covenant in a bond instrument, or other debt instrument to which the applicant is a party, the removal of beds from service may be used to meet the requirements of these standards. In this case, the applicant must meet the requirements of the "Addition of Acute Care Beds Standards" to return said beds to service.

4. The Authority may grant an exception to the reduction of beds to meet the 160% average daily census requirement if the applicant has experienced significant fluctuations in its occupancy levels and (a) the applicant is the sole hospital in a county or (b) the applicant has exceeded an 85% acute care occupancy level for two consecutive months during the past twelve (12) months.

5. An acute care facility which has removed acute care beds from its license pursuant to the requirements of Section III(B)(1) of these Standards, may restore acute care beds to its license if it meets the following requirements:

   a. The facility has experienced significant fluctuations in its occupancy levels;

   b. The facility has exceeded an 85% acute care occupancy level for two consecutive months during the past twelve (12) months;

   c. The facility may add up to 10% of the number of acute care beds on its current license on an annual basis without undergoing certificate of need review, however it may not exceed the number of acute care beds on its license immediately prior to the reduction of beds pursuant to Section III(B)(1) of these Standards; and,

   d. The facility must notify the Authority a minimum of ten (10) days prior to requesting an amendment increasing acute care beds on its license.

C. Critical access hospitals are not subject to the requirements of Section III(B).

## IV. *QUALITY*

The applicant making the proposal for renovation or replacement for hospital beds must be in compliance with applicable licensing or certification organization requirements or have in place a substantive and detailed plan to come into compliance with applicable licensing or certification requirements.

## V. *CONTINUUM OF CARE*

A. The applicant must demonstrate that the replacement or renovation under consideration is the most cost effective or otherwise most appropriate alternative to provide the needed services to the population to be served.

B. The applicant must demonstrate that it has an effective utilization review, peer review, quality assurance and discharge planning process.

## VI. *COST*

A. The applicant must demonstrate financial feasibility of the facility following completion of the replacement or renovation. The applicant must also demonstrate that the capital related costs of the project are consistent with the Authority's rate setting methodology in effect as of the date of application. The applicant must further demonstrate that the charges and costs used in projecting financial feasibility are equitable in comparison to prevailing rates for similar services in similar hospitals are defined by the Authority.

B. The applicant must demonstrate that the project is the superior alternative, after considering in significant detail the costs and effectiveness of the following alternatives:

1. Maintaining extant facilities;

2. The alternative project, if any, which is likely to result in the greatest increases in operating and cost efficiencies;

3. The alternative project, if any, which would use the lowest cost construction methods complying with licensing, accreditation, and building code requirements;

4. A combined analysis of items two and three above considering and analyzing the trade-offs between increases in operational efficiency juxtaposed with lower cost construction alternatives;

5. Merger, consolidation of facilities or sharing of services, and/or delivery of the service in an alternative setting; or

6. Closure of the service and/or such other alternative as may be suggested by the Authority.

C. The applicant shall submit reliable, probative and substantial evidence to demonstrate that the proposed square footage, construction cost per square foot and cost of fixed equipment for all nursing units, ancillary services and support areas directly affected by the replacement and/or renovation are appropriate and reasonable for the types and volumes of patients which are projected to utilize the hospital's services in the fifth year following completion of the project.

In preparing this objective analysis, the applicant must show that it has given prudent consideration to internal and external factors that will impact the operating environment of the hospital upon completion of the project.

The factors to be considered must include:

1. Trends in the demand for specific hospital services and recent demographic and/or medical practice changes that are likely to modify the trends.

2. The forecast of demand for the hospital's services based upon the most probable assumptions. The applicant must submit a comprehensive listing of the assumptions underlying the forecast.

3. If the physical layout of the hospital, following completion of the replacement or renovation, will be conducive to efficient staffing and transportation of patients.

4. If the physical layout of the hospital, following completion of the replacement of renovation, will seek to maximize the amount of net usable square footage available for patient care.

5. A search of the literature and an architect's certification regarding the amount of net usable square feet required for the performance of hospital activities at projected volume levels. The literature search shall include, but not be limited to, the requirements for state licensing or JCAHO Accreditation.

6. How the cost per square foot for replacement projects compares to the normal cost of good quality hospital construction as evidenced by recognized trade journals. For renovations, the applicant must consider how the

cost per square foot for renovation of hospital areas compares to—and should not exceed—the normal cost of replacement. Where practicable, the applicant should reference recognized trade journals, such as Means Square Foot Costs, BOECKH, Engineering News Record or Marshall and Swift. In determining normal cost adjustment, consideration should be given for the hospital departments involved, terrain, geographic area and other factors relevant to the source(s) utilized.

7. If the facility design and construction methods employed in the proposal will allow for flexibility to accommodate future changes in the mix of inpatient versus outpatient utilization at the hospital and the mix of services by the hospital.

8. How the hospital will accommodate disruption of normal operations during the period of construction and how savings in operating cost relate to increased capital cost incurred to minimize such disruptions.

9. The steps the hospital is taking to transfer inactive storage and other non-patient activities to less expensive off site areas.

10. Such other factors as may be requested by the Authority.

## VII. *SPECIALIZED ACUTE CARE*

A hospital may change its bed complement, within its approved licensed beds, among specialized units for services that are currently offered by the hospital and which do constitute the addition of a new institutional health service, or the deletion of an existing health service.

In addition to the criteria set forth elsewhere for the replacement or renovation of acute care facilities, proposals involving specialized acute care units must comply with the following requirements:

A. *Tertiary Pediatric Care Unit:* An application for the replacement or renovation of a tertiary pediatric care unit shall be in substantial compliance with the following:

Tertiary pediatric care units will be operated in only three West Virginia hospitals: West Virginia University Hospitals, Inc.,

Charleston Area Medical Center, and Cabell–Huntington Hospital.

B. *Neonatal Intensive Care Unit* An application for the replacement or renovation of Neonatal Intensive Care Unit (NICU) beds shall be in substantial compliance with the following guidelines.

1. The number of NICU beds shall not exceed four beds per 1000 live births in the service area.

2. Level II NICU services shall be centralized at West Virginia University Hospitals, Inc., Charleston Area Medical Center and Cabell–Huntington Hospital.

3. Level II NICU services shall be considered for approval only at hospitals performing at least 1100 deliveries per year.

C. *Obstetric Unit* An application for the replacement or renovation of obstetric unit beds shall be in substantial compliance with the following guidelines.

1. Level II and Level III obstetric units shall perform at least 1100 deliveries per year.

2. Level I obstetric units shall perform at least 750 deliveries per year.

3. New Level I obstetric units may be considered for approval based upon less than 750 deliveries per year if the absence of the service would result in a population of at least 5000 being more than 30 minutes normal driving time from another obstetric unit.

D. *Critical Care Unit* An application for the replacement or renovation of Intensive Care Unit (ICU) beds or Coronary Care Unit (CCU) beds (collectively referred to as critical care units) shall be in substantial compliance with the following guidelines.

1. An ICU or CCU shall be staffed with qualified personnel under the direction of one or more appropriately trained on-site physicians. A hospital offering ICU or CCU services shall have a physician on-site for immediate consultation twenty-four hours a day. A CCU shall have a cardiologist or internist with adequate training in cardiology

available for immediate consultation twenty-four hours a day.

2. Hospitals providing ICU or CCU services shall have in place with surrounding hospitals established protocols for the referral of stabilized patients. Hospitals which do not have ICU or CCU should have protocols to see that patients requiring such service be transferred as soon as possible after stabilization.

E. *Psychiatric Unit* An application for the replacement or renovation of psychiatric beds shall be in substantial compliance with the following guidelines.

1. A unit within a general acute care facility shall be specifically designated for the treatment of psychiatric patients and shall be designed to accommodate the special privacy, security and treatment requirements of the patients.

2. The applicant must demonstrate that each patient will have a treatment plan which includes a prioritization of major problems, stated in specific terms, with clear, concise and realistic goals and coordinated treatment modalities.

3. The applicant must clearly demonstrate that individuals requiring inpatient treatment will be discharged as soon as they are able to function in a less restrictive setting.

## VIII. *ACCESSIBILITY*

The proposal shall not adversely affect the continued viability of an existing hospital or health care services that serves a population of at least 10,000 not having 30–minute access to another hospital or critical access hospitals (CAH).

## IX. *OTHER CONSIDERATIONS*

The applicant must demonstrate that the renovation or replacement is in concert with the applicable sections of the applicant's long-range facility and strategic plan.

## X. *DEMONSTRATION PILOT PROJECT*

A. The Authority recognizes that occasionally certain acute care facilities which provide psychiatric services have excess capacity in their psychiatric units while other facilities in the same service area may need additional beds. In addition, existing State owned psychiatric beds operated by the Department of Health and Human Resources are insufficient to meet the needs of West Virginia.

As part of the Authority's health planning research activities and responsibility to gather information on access to care, and notwithstanding any contrary provisions in the Renovation–Replacement Standards, the Authority will allow a limited number of acute care facilities with excess capacity to lease psychiatric beds under the conditions and circumstances described below. During this Demonstration Project, the Authority will gather data on the success of these programs and will evaluate whether this arrangement should be allowed on a permanent basis in West Virginia.

B. The Authority will allow no more than two Demonstration Pilot Projects at acute care facilities for the provision of short term psychiatric services.

C. Acute care facilities that wish to apply for the Demonstration Pilot Project must submit their requests on forms prepared by the Authority.

D. Acute care facilities that wish to apply for the Demonstration Pilot Project must submit a signed copy of a collaborative agreement with all parties, including the Department of Health and Human Resources.

E. The application shall be a joint application with the Lessor facility and the Lessee facility. The following criteria must be met by the applicants:

1. The Lessor acute care facility must have a psychiatric unit with excess capacity.

2. The Lessee acute care facility must be a facility which currently provides psychiatric services and is in compliance with all federal and state requirements related to this service.

3. The Lessee must have a need for additional short term psychiatric beds.

4. The Lessee and Lessor must be located in the same acute care service area as defined by the State Health Plan.

F. The Demonstration Pilot Project will be for a two year period. The Lessor facility

will report to the Authority, on an as re-quested basis, any information the Authority may request to determine the feasibility of the continuation of the Demonstration Pilot Project. Should either applicant fail to com-ply with these standards at any time, the Authority may terminate the Demonstration Pilot Project.

G. The Authority's decision to grant a request to participate in the Demonstration Pilot Project does not constitute a Certificate of Need, or any entitlement to the facilities to provide these services beyond the terms of the pilot. During the pilot, the Authority will closely monitor the success of the pro-gram and will evaluate whether it is appro-priate to allow this arrangement to continue in West Virginia. The Authority may consult with the Department of Health and Human Resources in evaluating the success of this program.

STARCHER, J., dissenting.

Frankly, I have no idea whether the ma-jority opinion's reasoning is correct. I sus-pect, however, that the case for the five mile limitations' facial invalidity is not so pat or facile as the majority opinion suggests. Furthermore, the majority opinion fails to address the real concern of the appellee Fairmont General Hospital in this case—a negative effect on an established community hospital that is located but a few miles from the site of the proposed new hospital.

First, the issue of the facial validity of the "five mile limitation" was neither argued nor briefed to this Court—or, as far as I can see, to the circuit court. Consequently, this Court did not have the benefit of analysis, research, or advocacy on this issue from the excellent lawyers on all sides of this case—to lay out the positives and the negatives of the position taken by the majority opinion. Nor did this Court have before it the positions and analysis of other governmental and pri-vate actors who have a vital interest in the validity of the State's Health Plan—of which the "five mile limitation" is but a small part.

As Justice Davis has noted in her separate opinion, it is entirely possible that the major-ity opinion's gratuitous and unnecessary rul-ing has the potential to gut West Virginia's Health Plan. Whether the majority opinion has a sound basis for doing so is unknow-able—because there has been no adversarial testing of the theory adopted by the majori-ty.

This sort of "judicial activism" often occurs when courts arrogate to themselves the task of seeking out and deciding an issue that no one has brought to or argued before the Court. It is then that one may more often see opinions that are flawed in their premis-es, and that can wreak havoc that is un-thought of and unintended by the court that issued the opinion. I fear that the majority opinion in the instant case has such a poten-tial.

Second, where was the Health Care Au-thority's concern or lack of concern for the appellee taken into account in the opinion? Unfortunately, this is an example where the giants of an industry simply roll over a weak-er facility. Because of this decision, I prog-nosticate that within a few years following the opening of the grand new UHC facility along Interstate–79, Fairmont General Hos-pital will cease being a community-based hos-pital operated by a local board of directors. It will either have to "join Wal–Mart" and become part of the conglomerate, or it will be required to change its mission—perhaps to become a long-term care facility, or some-thing of such nature.

Having said all this, I reiterate that the majority might properly have reached its current conclusion—and I might have agreed with it—had all issues been vigorously pre-sented to this Court by the parties. Particu-larly, with respect to the "five mile limitation point," the instant case should have been ordered to be re-briefed and re-argued on the major issue identified by the majority. Then the members of this Court would have had a basis, and a clear right, to rule on the major issue raised by the majority opinion.

Absent such re-briefing and re-argument, this Court is "flying blind," and basically guessing at a proper result. I cannot join in such a "blind guess," so I dissent from the majority opinion's reasoning and its new syl-labus point.